UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DWAYNE RAYNARD DAVIS,                         15-CV-479-MJR
                                              DECISION AND ORDER
                    Plaintiff,

        -v-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
_____

        Pursuant to 28 U.S.C. §636(c), the parties have consented to disposition of this

case by a United States Magistrate Judge.  (Dkt. No. 13).

        Plaintiff Dwayne Raynard Davis brings this action pursuant to 42 U.S.C. §405(g)

seeking judicial review of the final decision of the Commissioner of Social Security

denying him Social Security disability insurance benefits under the Social Security Act

(the "Act").  Both parties have moved for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure.  For the following reasons, Davis' motion

(Dkt. No. 6) is granted, the Commissioner's motion (Dkt. No. 10) is denied, and this

case is remanded to the Commissioner for further administrative proceedings consistent

with this Decision and Order.

## **BACKGROUND**

I.      *Procedural History*

        On January 21, 2014, Davis, an Army veteran, filed an application for a period of

disability and disability insurance benefits ("DIB") alleging disability since March 1, 2010

due to post-traumatic stress disorder ("PTSD"), sleep apnea, thyroid disease, lower

back pain, right side facial pain, and temporomandibular joint disorder ("TMJ").  (*See* Tr. 49-54).[1]  The application was denied on March 25, 2014, after which Davis requested a hearing before an Administrative Law Judge.  (Tr. 55-60).  On September 8, 2014, Davis, represented by counsel, appeared before Administrative Law Judge William M. Weir (the "ALJ") for a hearing.  (Tr. 27-48).  On December 1, 2014, the ALJ issued a decision denying Davis' claim.  (Tr. 17-23).  Davis thereafter requested review by the Appeals Council.  (Tr. 12).  On April 3, 2015, the Appeals Council denied Davis' request, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4). This action followed.

II.    *Summary of the Evidence*

A.    *Medical Evidence*

i.    *Veterans Affairs Medical Center Records*

Davis alleges disability beginning March 1, 2010 and a date last insured ("DLI") of March 31, 2010, but there are no contemporaneous treatment notes from Davis' primary treating source, the Veterans Affairs Medical Center ("VAMC"), or from any other source, for this time period.  However, VAMC health summaries state that Davis experienced the following "problems" prior to March 31, 2010:  back injury, resolved in May 2003; lumbago in September 2005; lower leg and knee pain in November 2005; TMJ disorder, unspecified in July 2006; depressive disorder and obesity in March 2008; diarrhea, obesity, hypertension, impaired fasting glucose, and PTSD in June 2008; sleep apnea in August 2008; thoracic or lumbosacral neuritis or radiculitis, lumbar radiculopathy and spondylosis in September 2008; skin rash in December 2008; cough in November 2009; and testicular hypofunction in December 2009.   The health

---

[1]     References to "Tr." are to the administrative record in this case.

summaries further state that Davis had the following problems between June 2010 and December 2011:  obesity, depressive disorder, and sleep apnea in June 2010; cannabis abuse in July 2010; trigeminal neuralgia in February 2011; unspecified disorder of thyroid and unspecified vitamin D deficiency in April 2011; acute sinusitis in June 2011; and cellulitis and abscess of unspecified sites in December 2011.   The health summaries list problems for 2012 and 2013 as well.  (Tr. 183-85).

The VAMC treatment notes begin in March 2011.  They reflect that Davis has a disability rating of 100% for PTSD.  (Tr. 207).  Davis associated his PTSD with a motor vehicle accident that occurred in 1982, when he serving in the Army and stationed at Fort Stewart, Georgia.  (Tr. 208).  Davis reported having flashbacks, sleep problems, isolation, avoidance, and anger issues because of the accident.  (Tr. 209).  In April 2011, Davis attended a two-week residential rehabilitation program at the Batavia, New York VAMC to treat his PTSD.  (Tr. 207-14).   The program included individual psychotherapy, group therapy, socialization activities, pharmacological intervention, recreational therapy, and nutritional counseling.  (Tr. 213).  Davis' diagnoses were chronic, moderate PTSD and depressive disorder, not otherwise specified.  (Tr. 207). Between April 15, 2013 and March 4, 2014, Davis continuously attended individual and group therapy to treat his PTSD symptoms, anxiety, and depression.  (Tr. 188-206, 269-72, 277-79, 281, 283-84, 286-88, 304-06).

The VAMC treatment notes further reflect that Davis has disability ratings of 30% for limited jaw motion; 10% for lumbosacral or cervical strain; 10% for superficial scars; 10% for facial scars; and 0% for muscle injury.  (Tr. 207).  Davis' disabilities were found to be 100% service connected.  (*Id.*).  On October 17, 2011, Davis visited physician

assistant Michael Rudzinski in connection with an application for VA disability benefits. Rudzinski performed four examinations on Davis, beginning with a cranial nerves diseases Compensation and Pension ("C&P") examination for trigeminal neuralgia. Davis told Rudzinski that he had TMJ for about 25 years, and that beginning in December 2010, he had severe pain in the right side of his jaw, temple, and occipital area. The pain was so extreme that it brought Davis to tears. His cranial nerve V strength was normal, but he had severe incomplete paralysis, which the VA defines as a degree of lost or impaired function substantially less than complete paralysis. He also had severe sensitivity to light touch in all three parts of the trigeminal nerve. Rudzinski opined that Davis' severe pain impacts his ability to work. (Tr. 216-26).

Next, Davis underwent a thoracolumbar spine C&P examination for degenerative joint disease. Davis stated that he had lower back problems since his military service, and that he previously had an epidural injection. He reported having severe two to three hour flare-ups three to four times a month, during which he could not get out of bed. He occasionally used a back brace, and regularly used a walker. On examination, Davis had painful restricted forward flexion, extension, and lateral flexion bilaterally, and painful lateral rotation bilaterally. He also had localized tenderness in his lower back. An imaging study of Davis' thoracolumbar spine showed arthritis. Rudzinski opined that Davis' back condition impacts his ability to work, and that he cannot perform any physical labor. (Tr. 226-37).

Davis next underwent an elbow and forearm C&P examination for left elbow strain. Davis had injured his left elbow in the Army. The injury caused ten to twenty minute flare-ups with severe pain two to four times a month. On examination, Davis

had restricted left and right elbow flexion and restricted left elbow extension during initial range of motion measurements, and restricted left and right elbow flexion and left elbow extension post-test.   Imaging revealed an olecranon spur in one of Davis' elbows. Rudzinski opined that Davis' condition makes it difficult for him to lift with his left arm and impacts his ability to work.  (Tr. 237-48).

Finally, Davis underwent a C&P examination for scars/disfigurement.  Davis has two painful scars on and around his right ear from TMJ surgery and one painful scar on his right thigh from a skin graft.  Rudzinski opined that the scars impact Davis' ability to work because they cause him constant pain.  (Tr. 248-61).

The day after Rudzinski performed the examinations, Davis underwent a dental C&P examination for TMJ disorder by Guy Ditursi, DDS.  When he was in the Army, Davis hit his chin, driving his mandible back.  The injury caused him chronic TMJ pain, mainly on the right side of his face.  Although he underwent splint therapy and TMJ surgery, he still experienced pain.   A physical examination revealed that Davis had significant functional loss and loss of motion from TMJ, and that he experienced difficulty eating solid food and opening his mouth.  Ditursi did not believe that Davis' TMJ is related to his trigeminal neuralgia.  (Tr. 214-16).

ii. _UB Neurosurgery Records_

In May 2014, the Social Security Administration asked UB Neurosurgery to provide it with Davis' records from March 2009 to the present, and for one of its treating physicians to complete a medical source statement.  UB Neurosurgery provided Davis' records, but it declined to complete a medical source statement because there had not been a "formal functional capacity evaluation."  (Tr. 327-34).

The UB Neurosurgery records show that Davis began treating there in 2012.  On October 16, 2012, Davis visited Adult Nurse Practitioner Laura Lewis Mason complaining of jaw pain.  Davis reported that he injured his jaw when he was in the Army, and that a piece of his jaw had been surgically removed.  Davis complained that applying pressure to the right side of his face — for example, chewing — causes him right jaw pain that radiates into his temple and eye and extends into his neck and shoulders.  He experienced this pain once or twice a week.  After consulting a doctor, Mason recommended a fine cut CT scan to determine if a bony abnormality irritated the nerve.  She also noted her concern of trigeminal neuralgia.  (Tr. 345-46).

On February 25, 2013, Davis visited Dr. Maxim Mokin and Dr. Elad Levy complaining of continuing pain.  Dr. Mokin concluded that Davis suffers from trigeminal neuralgia.  (Tr. 343-44).

On December 12, 2013, Davis visited Dr. Adnan Siddiqui and reported having pain around the temporomandibular joint.  The pain "radiate[d] into his temple with an ice pick type pain" and continued into the bridge of his nose and the right side of his head.  The pain caused his nose to run and his eyes to tear.  Dr. Siddiqui diagnosed Davis with nerve disorder facial other, jaw disease unspecified, trigeminal neuralgia, and facial pain atypical.  (Tr. 339-40).

iii.  _Dr. Totin's Review Opinion_

On March 25, 2014, non-examining state agency review psychologist Martha Totin reviewed Davis' medical records in connection with his DIB application.  Dr. Totin noted the absence of medical evidence from March 2010 before concluding that there is

"[i]nsufficient evidence to determine [the] severity of [the] impairment prior to [the] DLI." (Tr. 52-53, 324-26).

   B. *Administrative Hearing*

   The ALJ began the hearing by asking Roman Fontana, Davis' former counsel, if he had any preliminary issues or additional documentation.  (Tr. 29).  Counsel advised the ALJ that he was recently retained, and he requested permission to submit a brief and additional medical documentation after the hearing.  (Tr. 30).  The ALJ then recited the pre-DLI "problems" in Davis' health summaries, but noted that the record does not contain any clinical notes to substantiate those problems, as the VAMC treatment notes begin in March 2011.  (Tr. 31).  The ALJ asked counsel to submit the missing records if he has access to them.  (Tr. 29-31).

   Davis, who was 54 years old at the time of the hearing, joined the Army in 1979 and served as a tank commander.  It was his first job.[2]  Counsel asked Davis to describe the event that caused his diagnoses, but Davis demurred, stating that "it's kind of hard to describe."  Davis then began describing the event, but could not continue.  He stated:  "God, it's hard to, it's hard to say . . . it's hard for me to talk about it."  The ALJ gave Davis permission to read an email that described the event, and Davis continued to testify.  (Tr. 31-33).

   The event concerned a motor vehicle accident at Fort Stewart in 1982.  Davis was in the second truck of a three-truck convoy traveling to a firing range.  The trucks were filled with soldiers and heavy armory.  Davis heard someone in the front of his truck scream, and the truck's brakes screeched.  (Tr. 33-34).  Davis later learned that the first truck in the convoy stopped to avoid hitting a deer, causing the other trucks to

---

[2]      Davis earned a GED in 1980.  (Tr. 117).

crash.  (Tr. 209).  Davis' body pressed against the wall of the cab and two soldiers flew toward him.  At this point in his testimony, Davis again stopped, stating "I can't do it." After a break, Davis testified that the soldiers rolled off of him but his legs were pinned. Someone yelled that the truck was going to explode, and the soldiers started to panic. A truck then hit his truck, and the soldiers jumped on each other to get out of the vehicle.  Other soldiers pulled Davis from the truck and laid him in a field.  He was taken to a hospital, where a cast was placed on one leg and a brace on the other.  He could not work for approximately four months.  Davis has had nightmares and anxiety attacks since the accident.  (Tr. 34-37).

Davis was discharged from the Army in 1987, after which he worked in a post office for two years.  Davis struggled to be nice to customers, so he was moved into the back of the office to sort mail.  He was later terminated for fighting with a co-worker. After the post office, Davis was incarcerated for two years.[3]  Upon his release, he worked in a bakery.  Davis helped run another business, but the business failed because Davis could not get out of bed.  Davis testified that he has not worked since 2013.  (Tr. 37-45).

At some point, Davis attempted suicide, and he went to the VAMC for treatment. The VAMC did not diagnose him with PTSD at that time.  "[Y]ears later," Davis had a breakdown and could not stop crying.  He returned to the VAMC and received proper treatment.  He testified that his treatment has been effective and non-effective. Although he has been able to share his feelings with other veterans, he still has anxiety. His PTSD symptoms have remained the same "for years."  (Tr. 38-41).

---

[3]     A disability questionnaire indicates that Davis was incarcerated "for being violent."  (Tr. 135).

Davis also testified about his physical health.  His "worst condition" is trigeminal neuralgia, which causes him unbearable pain and leaves him incapacitated.  He also has leg and back problems — his left knee "will go out unexpectedly," and his back pain radiates down his legs into his toes.  He has difficulty sitting and laying down for long periods of time.  (Tr. 39-40).

At the conclusion of Davis' testimony, the ALJ cited Davis' disability ratings for PTSD and trigeminal neuralgia from the administrative record, but stated that he did not have any clinical records from March 1 to March 31, 2010.  (Tr. 45 ("I have no clinical records during any of the, for the, we've got a month that we're working with here.")).  The ALJ reiterated that he had no documents to substantiate Davis' conditions and his resulting limitations during this period, although he did acknowledge that Davis has "many medical issues going on."  The ALJ agreed to keep the record open for two weeks so that Davis' counsel could submit additional medical records and a brief.  Counsel did note that he had difficulty obtaining records from the VA.  The ALJ said that he understood, as his office attempts to get records from there as well.  The ALJ directed counsel to advise him of any problems he might have in obtaining the records.  (Tr. 45-47).

After the hearing, the ALJ did not receive medical records or a brief from former counsel.  (Tr. 21).  The ALJ's office left two messages with counsel, the second of which cautioned him that the record would close on October 21, 2014 if he failed to respond.  (*Id.*).  Counsel did not respond.  (*Id.*).  Thus, the ALJ considered the record closed and issued an unfavorable decision on December 1, 2014.  (Tr. 23).  In January 2015, Davis retained new counsel, Kenneth Hiller.  Hiller requested permission from the Appeals

Council to submit legal argument and additional evidence.   (Tr. 12).   No additional evidence was provided to the Appeals Council or to this Court.   (Tr. 1-4).

## **DISCUSSION**

I.    _Scope of Judicial Review_

The Court's review of the Commissioner's decision is deferential.   Under the Act, the Commissioner's factual determinations "shall be conclusive" so long as they are "supported by substantial evidence," 42 U.S.C. §405(g), that is, supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." _Richardson v. Perales_, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted).   "The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts." _Smith v. Colvin_, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014).   "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may not "substitute [its] judgment for that of the Commissioner."   _Veino v. Barnhart_, 312 F.3d 578, 586 (2d Cir. 2002).   Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner."   _Silvers v. Colvin_, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (quoting _Sample v. Schweiker_, 694 F.2d 639, 642 (9th Cir. 1982)).

While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct.   The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence.   Further, the Commissioner's factual

conclusions, even if supported by substantial evidence, must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to do so is reversible error. *Id.*

II.     *Standards for Determining "Disability" Under the Act*

In order to be entitled to disability insurance benefits, the claimant must be under a disability prior to his date last insured — in Davis' case, on or before March 31, 2010. A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Commissioner may conclude that a claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for the work." *Id.* §423(d)(2)(A). The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and . . . [the claimant's] educational background, age, and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (first alteration in original) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process." 20 C.F.R. §404.1520(a)(4). These steps proceed as follows.

First, the Commissioner determines whether the claimant is "working" and whether that work "is substantial gainful activity." *Id.* §404.1520(b). If the claimant is engaged in substantial gainful activity, the Commissioner's inquiry is over: the claimant is "not disabled regardless of [his or her] medical condition or . . . age, education, and work experience." *Id.*

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner asks whether the claimant has a "severe impairment." *Id.* §404.1520(c). To make this determination, the Commissioner asks whether the claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* As with the first step, if the claimant does not have a severe impairment, he or she is not disabled regardless of any other factors or considerations. *Id.*

Third, if the claimant does have a severe impairment, the Commissioner asks two additional questions: first, whether that severe impairment meets the Act's duration requirement, and second, whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is otherwise "equal to" an impairment listed in Appendix 1. *Id.* §404.1520(d). If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.*

If, however, the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five.  Before doing so, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence" in the record. *Id.* §404.1520(e).  Residual functional capacity "is the most [the claimant] can still do despite [his or her] limitations."  *Id.* §404.1545(a)(1).  The Commissioner's assessment of the claimant's residual functional capacity is then applied at steps four and five.

At step four, the Commissioner "compare[s] [the claimant's] residual functional capacity assessment . . . with the physical and mental demands of [his or her] past relevant work."  *Id.* §404.1520(f).  If, based on that assessment, the claimant is able to perform his or her past work, the Commissioner will find that the claimant is not disabled within the meaning of the Act.  *Id.*

Finally, if the claimant cannot perform his or her past relevant work, the Commissioner considers whether, based on the claimant's residual functional capacity assessment, age, education, and work experience, the claimant "can make an adjustment to other work."  *Id.* §404.1520(g)(1).  If the claimant can adjust to other work, he or she is not disabled.  *Id.*  If, however, the claimant cannot perform any other work, he or she is disabled within the meaning of the Act.  *Id.*

The burden through steps one through four described above rests on the claimant.  If the claimant carries his burden through the first four steps, "the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform."  *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

III.    *The ALJ's Decision*

The ALJ followed the required five-step process for evaluating disability claims. Under step one, the ALJ found that Davis had not performed substantial gainful activity from his alleged onset date of March 1, 2010 through his DLI of March 31, 2010.  (Tr. 19).  At the second step, the ALJ determined that Davis had the following conditions through March 31, 2010:  PTSD; obstructive sleep apnea; lower back pain; right side facial pain; thyroid disease; TMJ; and obesity.  (*Id.*).  However, relying on the absence of treatment records prior to March 31, 2010, the ALJ found that Davis' conditions did not significantly limit his ability to perform basic work activities for twelve consecutive months, as required to establish a "severe impairment" under the second step.  (Tr. 21-22).  Accordingly, the ALJ ruled that Davis is not disabled within the meaning of the Act.

IV.    *Davis' Challenge*

Davis challenges the Commissioner's determination on the ground that the ALJ purportedly failed to develop the record by not obtaining treatment records that pre-date March 31, 2010.  (Dkt. No. 6-1 at 14).  In particular, after the ALJ noted the lack of treatment documents prior to that date, he kept the record open to allow counsel to submit the documents.  Counsel never provided the documents, and the ALJ issued an unfavorable decision.  Davis argues that the ALJ should have taken it upon himself to obtain the documents.

Given "the essentially non-adversarial nature of a benefits proceeding," the ALJ "must . . . affirmatively develop the record."  *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also* 20 C.F.R. §404.900(b) ("In making a determination or decision in

your case, we conduct the administrative review process in an informal, non-adversarial manner."). The ALJ's duty to develop the record applies even when the claimant is represented by counsel. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). The duty is not without limit — the ALJ need only make every *reasonable* effort to assist the claimant in obtaining his medical records. 42 U.S.C. §423(d)(5)(B); 20 C.F.R. 404.1512(d); *see also Mauzy v. Colvin*, No. 5:12-cv-866(GLS/ESH), 2014 WL 582246, at *7 (N.D.N.Y. Feb. 13, 2014) ("Mere absence of some medical records does not suffice. An affirmative obligation to develop an administrative record does not extend to infinity, and is not without limit. Reviewing courts require only *reasonable* efforts to help claimants get medical reports from their own medical sources.") (internal citation omitted).

"The law is unsettled as to whether a request from an ALJ to counsel to obtain additional information satisfies the duty to develop the record." *Rivera v. Comm'r of Soc. Sec.*, No. 14 Civ. 6567(KPF), 2015 WL 6619367, at *12 (S.D.N.Y. Oct. 30, 2015); *see also Harris v. Colvin*, No. 11-CV-1497, 2013 WL 5278718, at *7 (N.D.N.Y. Sept. 18, 2013) (noting conflicting case law within Second Circuit as to whether the ALJ can satisfy his duty to develop the record by relying on counsel to obtain records); *Jordan v. Comm'r of Soc. Sec.*, 142 F. App'x 542, 543 (2d Cir. 2005) (summary order) (finding that the ALJ fulfilled his duty to develop the record where counsel volunteered to obtain documents from the plaintiff's treating physician; the ALJ kept the record open to allow counsel to submit the documents; counsel later advised that he had "nothing further to add"; and counsel did not request the ALJ to help him obtain the documents).

However, as relevant here, courts have held that if certain medical records are central to the disability determination, counsel's failure to provide the records does not excuse the ALJ from making a good faith effort to obtain the records on his own. *See Cadet v. Colvin*, 121 F. Supp. 3d 317, 321 (W.D.N.Y. 2015) (remanding for further development of the record where counsel failed to provide treatment records and the ALJ did not make an effort to obtain the records on his own); *Apolito v. Astrue*, No. 11-CV-1065(TJM/VEB), 2012 WL 6787365, at *3-5 (N.D.N.Y. Nov. 5, 2012) (remanding for further development of the record where counsel could not obtain records from the plaintiff's psychiatrist, the ALJ did not make his own effort to obtain the records, and the records were "central to the disability determination"), *report and recommendation adopted*, 2013 WL 66706 (N.D.N.Y. Jan. 4, 2013); *Curtis v. Astrue*, No. 11-CV-786(GTS/VEB), 2012 WL 6098258, at *3-5 (N.D.N.Y. Oct. 30, 2012) (remanding for further development of the record where counsel failed to provide records from the plaintiff's treating physician, the ALJ did not make his own effort to obtain the records, and the records were "central to the disability determination"), *report and recommendation adopted*, 2012 WL 6098256 (N.D.N.Y. Dec. 7, 2012).

In light of Davis' March 1, 2010 onset date and his March 31, 2010 DLI, treatment records for this period of time are critical to determining disability. In keeping the record open and asking counsel to provide the missing records, the ALJ acknowledged their importance:

> I have no clinical records during any of the, for the, *we've got a month that we're working with here.* . . . Okay, so, so what we're missing here is the, is the substantiation et al, and then beyond that the degree of limitations that flow from any substantiation. *So that's, obviously, going to be critical in, in determining this case.*

- 16 -

(Tr. 45) (emphasis added).  The ALJ ultimately pointed to the absence of the treatment records in finding that Davis' conditions did not significantly limit his ability to perform basic work activities for twelve consecutive months, as required to establish a "severe impairment" under the second step of the five-step process.  Given the significance of the missing records and the impact their absence had on the ALJ's decision, the ALJ should have tried to obtain the records on his own after not hearing from Davis' counsel.  By not doing so, the ALJ created a gap in the record that necessitates remand.

The record suggests that the VAMC does in fact have treatment records prior to March 31, 2010.  The VAMC health summaries for Davis state that he experienced several "problems" before that date, including a back injury resolved in May 2003; lumbago in September 2005; lower leg and knee pain in November 2005; TMJ disorder, unspecified in July 2006; depressive disorder and obesity in March 2008; diarrhea, obesity, hypertension, impaired fasting glucose, and PTSD in June 2008; sleep apnea in August 2008; and thoracic or lumbosacral neuritis or radiculitis, lumbar radiculopathy and spondylosis in September 2008.  As Davis' primary treating source, the VAMC presumably has treatment documents relating to these problems.  Moreover, the record suggests that Davis began treating at the VAMC as early as 1987, the year he was discharged from the Army.  (*See* Tr. 122).  Even if, however, the VAMC does not have any records prior to March 31, 2010, confirming as much will allow for more effective review should the ALJ again deny Davis' request for benefits.

In addition to the lack of treatment documents, the record does not contain any opinion evidence as to Davis' limitations in March 2010.  Dr. Totin had set out to opine

on Davis' limitations, but she could not do so because of the lack of treatment records. It does not appear that the ALJ attempted to obtain an opinion from another source.

Accordingly, for these reasons, this case is remanded for further administrative proceedings consistent with this Decision and Order, including but not limited to obtaining VAMC treatment records pre-dating March 31, 2010 and opinion evidence sufficient to complete the record and render a new decision.

The Court's decision to remand this proceeding does not mean that Davis' former counsel's actions are to be condoned.  Had counsel fulfilled his promise to obtain the records, the ALJ may very well have ruled in Davis' favor, thus sparing Davis and the Commissioner the burden of litigating this action and the Court from having to expend its resources to resolve it.

## CONCLUSION

For the foregoing reasons, Davis' motion (Dkt. No. 6) is granted, the Commissioner's motion (Dkt. No. 10) is denied, and this case is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

The Clerk of Court shall take all steps necessary to close this case.

**SO ORDERED.**

Dated:        September 9, 2016
              Buffalo, New York

                              */s/ Michael J. Roemer*
                              MICHAEL J. ROEMER
                              United States Magistrate Judge